## GREENWOOD v. THE STATE.

CRIMINAL LAW. *Corporations. Double punishment. Offenses punished by corporations may be punished by State also.* Where a party has been convicted and punished for keeping a gaming house by the municipal authorities of a town or city, this is no bar to a prosecution for the same offense by the State.

Cases cited: The State v. Reynolds, 4 Hay., 110; Meacher v. Mayor of Chattanooga, 1 Head., 74; Nolin v. Mayor of Franklin, 4 Yer., 163; State v. Shelbyville, 4 Sneed, 176.

---

FROM SHELBY.

---

Appeal from the Criminal Court. JNO. R. FLIPPIN, Judge.

ATTORNEY-GENERAL HEISKELL for the State.

L. B. HORRIGAN for defendant.

FREEMAN, J., delivered the opinion of the court.

Greenwood and others were indicted in the Criminal Court of Shelby county for keeping a gaming house. The matter of defense set up by the defendant was a former conviction, which was presented in the form of an agreement between the Attorney General and the defendant, and is as follows:

1. That if defendant kept a gaming house, it was within the corporate limits of the city.

2. That the said defendant has been regularly

fined and punished by the lawful municipal authorities, or court for the said city, for the said offense of keeping a gaming house mentioned in said indictment.

The parties add further, that all formalities of pleading are expressly waived, and the question desired to be passed upon by the court is, whether the said defendant, after being fined, convicted and punished by the municipal government, or its proper officials, for the said offense, can be held by the State to answer for the identical offense.

The question presented for our decision is, whether, where a party has been convicted and punished for keeping a gaming house by the municipal authorities of a town or city, this fact is a bar to a prosecution for the same offense by the State.

We may remark, that art. 5 of Amendments to the Constitution of the United States, providing, among other things, that "no person shall be subject for the same offense to be twice put in jeopardy of life or limb," has no application to the States, being only a limitation on the Federal Government. 7 Peters, 243; 7 Wall., 326, and cases there cited. Our own Constitution, art. 1, sec. 10, is, that "no person shall for the same offense be twice put in jeopardy of life and limb," the language being identical with that of the Constitution of the United States.

Whether this clause, or the same provision in the Constitution of the United States, applies to offenses the punishment of which does not extend to "life or limb," or to crimes as distinguished from misdemean-

ors, and was not intended originally to give the high sanction of a constitutional guaranty against the repetition of the prosecution only in such cases, we need not decide at present. That this is the literal meaning of the language is pretty clear, and it was certainly understood to apply only to offenses punished by loss of life or limb, by our earlier judges on this bench, as held in the case of *The State* v. *Reynolds,* 4 Hay., 110, decided in 1817. In that case a party had been acquitted of perjury, and it was sought to have the case reviewed in that court by appeal on the part of the State. . The court, in referring to the rule of the common law, and enforcing it, that no one could be put in jeopardy twice for the same offense, say that this article of the Bill of rights had no application to the question, "for here the punishment does not extend to life or limb." However, as held by the court in that case, it is well settled by the common law that no one could be twice put in jeopardy for the same offense, and so, whether the protection sought is found in the Constitution or in the common law, in this case, it equally presents the same difficulty in its solution.

In endeavoring to arrive at a proper conclusion on this question, we must remember, according to the idea of Judge Cooley in the case of *The People* v. *Hurlburt,* 24 Mich. R., 96, that the Constitution of our State assumes the existence of counties and municipal corporations, the latter having and exercising such powers of local self-government under grants in charters from the Legislature as might be necessary

for their proper regulation, and the maintenance of the peace, good order and protection of the people thus aggregated in large masses. That the existence of such municipal corporations being assumed and recognized in the Constitution as part of the arrangement contemplated to make up the machinery of the great corporate body, the State, it must be fairly understood that the people or convention contemplated that these corporations should have and exercise all the usual powers proper and necessary for the perpetuation of their existence, and for the due regulation of their peculiar life, so to speak. We therefore conclude, that whatever may have been the usual powers granted or ordinarily held by these corporate bodies at the organization of our government, and whatever powers necessary and proper to be exercised by them, as an incident to their existence, as part of the machinery of the government of the State, were expected to be continued to them under legislative grants in their charters, and this by the very fact of the clear recognition of the fact that such bodies should exist in the Constitution of our State.

As à matter of history, we know that the organization of municipal corporations was one of the most efficient agencies by which freedom and government by law, rather than strong hand, was introduced and fostered in Europe in the middle ages. Robinson, in his view of the progress of society in Europe, Introduction to History of Charles V., p. 19, in referring to the institutions which had tended to secure the liberty and independence of the people, says: "The form-

ing of cities into communities, corporations, or bodies politic, and granting them privileges of municipal jurisdiction, contributed more, perhaps, than any other cause to introduce regular government, police and arts, and diffuse them over Europe," than any one of the various causes which he enumerates in his essay as contributing to these desirable ends.   In enumerating the powers which were thus obtained by these chartered communities, among other important rights, the same author says: "They were recognized as bodies politic to be governed by a council and magistrates of their own nomination.   These magistrates had the right of administering justice within their own precincts, of levying taxes, of embodying and training to arms the militia of the town, which were officered by men appointed by the municipal authorities.   These institutions, originating in this form in Italy in the twelfth century, adopted in France soon after, were in no great length of time transferred to England, the country from whence we derive our jurisprudence.   There, it is true, modified in some of their aspects to meet the wants of a great people, and being gradually, to a greater or less extent, subordinated to the general control of the supreme legislative body, the Parliament, yet still maintaining many of their chartered rights as inviolable, and clinging to them as essential to their freedom and even their existence, as one of the subordinate political divisions of the State, continued up to the time of the separation of the colonies from that country.

In this form we received this institution, and our

political fabric has been reared, so to speak, with the
municipal corporation as one of its integral elements,
forming, as we may readily see, one of the necessary
parts of the social and political organization under
which we live, without which the government of the
State would be incomplete, and utterly fail to attain
one of its great ends, the protection and security of
person and property in towns and cities, as well as
throughout its entire territory.

With this history of these institutions, and in view
of the necessity of having such bodies, from the or-
ganization of the government down to the present
time, acts of incorporation have been granted to our
cities and towns, granting them such powers as were
deemed proper for the attainment of the ends of their
creation. Among the powers so granted, are: "To
pass such by-laws and ordinances for the removal of
nuisances, to define by corporation laws misdemeanors,
when committed within their limits, and make such
acts offenses against such corporation laws, punished
by pecuniary fines and penalties, which have been col-
lected on a warrant issued by the mayor, recorder or
other judicial officer of the corporation, in form of a
debt, but in fact for the recovery of a penalty, for-
feiture, or a fine, the name, in the language of the
court in 1 Head., 74, being immaterial." In such
cases, the fine or forfeiture imposed by the corpora-
tion ordinances is recovered, on proof that the offense
has been committed, which is prohibited by the stat-
ute. See the above case.

The case referred to was a warrant for recovery of

fifty dollars, in consequence of a forfeiture or penalty, incurred for a misdemeanor for keeping a disorderly house in Chattanooga, contrary to a by-law of said town.

Sec. 35 of Amended Charter of the City of Memphis, provides, among other things, "the general council shall have power to establish a workhouse in the county of Shelby, to define by law or ordinance misdemeanors, and when committed within the city limits, to punish the same by pecuniary fines and penalties, and by imprisonment and labor within or without a workhouse in default of payment of said fine, to regulate and suppress all disorderly houses and houses of ill-fame, to restrain, prohibit, and punish gaming.

It is clear, under this charter, the city had the power to punish or fine the parties in these cases, by way of restraining, prohibiting, or punishing gaming.

It has been held in *Nolin* v. *Mayor of Franklin*, 4 Yerg., 163, that exhibiting a stud-horse in the streets of a town is a nuisance; and keeping hogs, alehouses, gaming-houses, brothels, etc.; and in *State* v. *Shelbyville*, 4 Sneed, 176, that a corporation empowered by its charter to remove nuisances, was indictable for failure to remove a slaughter-house for hogs within its limits, as being injurious to the health of the inhabitants.

From the principle of these cases, and from the general principles of the law growing out of the necessities of such incorporated municipalities, it is clear that such offenses as are referred to above, and such as are involved in the present cases, are held and

deemed to have in them elements of an offense or
misdemeanor against the rights of such corporations,
and as such they may be punished by a corporation
proceeding, with a view of restraining or prohibiting
such acts within the limits of such bodies, and that
in doing so, it is only the peculiar offense against the
corporation that is punished, and not any violation of
any State law that may prohibit such acts throughout
the entire territory of the State, and inflict such pen-
alties for the violation of this law as may be appro-
priated in such cases.    That the offense of keeping a
gaming-house is one that may and does present many
elements of criminality in a city or town, by debauch-
ing the morals of the youth, presenting temptations to
all inclined to yield to them, calculated to lead them
into the ways of vice and crime, and that these evil
influences are far more active and powerful in towns
and cities than in the country, therefore productive of
a wider spread injury, and one specifically affecting the
interest and good morals of the incorporated commun-
ity, will be readily admitted by all.    It is, therefore,
highly proper that this aggravated nuisance should be
subject to the control of and restraints imposed by the
ordinances of these local governments peculiarly affected
by the evil.

We therefore conclude, that in view of the facts
and necessities of the case, it cannot be understood
that by the common law of any civilized country of
the present day, deriving its jurisprudence from En-
glish sources—that the rule forbidding a party to be
punished twice for the same offense—was intended to

include, and be held to apply to the case of punishment by these corporate authorities for the wrong done them and their peace, security, and morals, so as to be a bar to a prosecution on the part of the State, and infliction of such punishment as she may deem proper to inflict by law upon her citizen. The fact that he is both a citizen of the State and also of a corporation, and is therefore amenable to both jurisdictions for any violation of the law of either, and that each may choose to forbid an act, and inflict a penalty for its violation, ought not, we think, make any difference. He can readily avoid such inflictions by obedience to the laws of the communities of which he is a member, and if he chooses to defy constituted authority, courts organized, not only for the punishment but suppression of crime, as far as they may be able, should feel but little sympathy with such offenders.

Mr. Cooley, in his work on Constitutional Limitations, citing a number of cases, lays down the principle "that the same act may constitute an offense both against the State and the municipal corporation, and both may punish it without violation of any constitutional principle," p. 199. In the case of *Mayor of Mobile* v. *Allaine*, 14 Ala., 400, cited in a note, we think a correct view of the question is stated: "The object of the power conferred by the charter, say the court, and the purposes of the ordinance itself, was not to punish for an offense against the criminal justice of the country, but to provide a mere police regulation for the enforcement of good order and quiet

within the limits of the town. So far as an offense has been committed against the public peace and morals, the corporate authorities have no power to punish. It is immaterial whether the State has punished the party or not, the prosecution at the suit of each proceeds upon a different hypothesis; the one contemplates the observance of the peace and good order of the city, the other has a more enlarged object in view, the maintenance of the peace and dignity of the State."

In support of the view we have indicated, that the common law did not intend that punishment by a corporate authority should prevent the action of the State, we find the principle thus stated in a note to p. 311 of Dillon on Municipal Corporations: "In England, a by-law imposing a penalty on a corporator for refusing to serve in a corporate office is valid, notwithstanding the party may be indicted for the same refusal, as he may be in all cases of municipal offices necessary or proper to carry on the government of the corporation;" for which he cites Grant on Corporations, p. 82. In the same note it is said, "a distinction was early taken, in England, between grave offenses classified as pleas of the crown, and triable upon an issue of not guilty between the King and the defendant, and lesser or petty offenses punishable by fine or *amerciament* upon presentment in court, sect, or inferior jurisdictions." For this is cited Hale's Pleas of the Crown, vol. 1, E. 11; vol. 2, chap. 19. We think this presents the true line of distinction, and is the sound rule to be applied in the cases be-

fore us, one which may be well designated as the common law of the case—that is a rule of right rea- son, growing out of the demands of our social and political organization, applied to the particular case in hand.

We do not feel called upon to define what may be included in the general idea of corporation offenses, for like fraud, it would be very difficult to give a definition that would include all the cases that may arise in our present state of society, and still more difficult to give one that would meet all the aspects of future social life that may grow up in our cities, calculated to debauch and deprave the morals of such communities, or give offense to public decency and propriety. We leave the cases to be provided for as they may arise, and the validity of ordinances passed to meet them, to be tested, when the cases are pre- sented, by the general rules of law already established for the purpose, such as that the ordinance must not be oppressive, nor in violation of the general law of the land, and other well-known rules on this subject.

We need not refer to the authorities presented by counsel on this question. Suffice it to say, that in some of them a different conclusion has been reached from what we have arrived at, but we think the large preponderance is in favor of the rule we have laid down in' this case, though not for the precise same reasons herein given.

The result is, that the judgment of the court be- low will be affirmed.